Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| ÁNGEL LUIS NIEVES RODRÍGUEZ<br><br>Apelante<br><br>v.<br><br>THE CLOROX COMPANY<br><br>Apelado | KLAN202500308 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso número: PO2024CV00916<br><br>Sobre: Discrimen y represalia |
| --- | --- | --- |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 23 de junio de 2025.

Comparece la parte apelante, Angel Luis Nieves Rodríguez, y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce, el 2 de abril de 2025, notificada el 4 del mismo mes y año. Mediante dicho dictamen, el foro primario desestimó, con perjuicio, la acción incoada por la parte apelante.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

### I

El 4 de abril de 2024, Ángel Luis Nieves Rodríguez (Nieves Rodríguez o apelante) incoó una *Querella* sobre discrimen y represalia en contra de Clorox Manufacturing Company of Puerto Rico, Inc. (Clorox o apelado).[1] Indicó que, en el mes de abril del 2006, comenzó a trabajar para Clorox y, actualmente, ocupa la posición

---

[1] Entrada Núm. 1 del Caso Núm. PO2024CV00916 en el Sistema Unificado de Manejo de Casos (SUMAC).

Número Identificador

SEN2025 _____

de *group leader* en el almacén central de la compañía. Alegó que por motivo de su antigüedad, fue asignado a trabajar un turno de 5:00 am a 1:30 pm. Asimismo adujo que, en todo momento, su desempeño ha sido de excelencia, toda vez que ha logrado cumplir con los deberes y funciones de su posición. Sin embargo, señaló que, luego de presentar unas quejas en cuanto a sus términos y condiciones de trabajo, su supervisora, Zuhei Vázquez (Vázquez o supervisora), comenzó a tomar acciones adversas en su contra. Especificó que Vázquez removió prácticamente todos sus deberes y funciones de importancia, así como los de *group leader* y aquellos relacionados a la supervisión de empleados, y le asignó los mismos a Alexander Meléndez (Meléndez). Asimismo, adujo que Vázquez le quitó su deber de asistir a las reuniones diarias con otros oficiales y supervisores de Clorox, en las cuales se discutían asuntos relacionados a las operaciones de Clorox y del almacén. Alegó que Vázquez le asignó los deberes de un operador de montacarga y lo asignó a cubrir el turno de trabajo de 9:00a.m. a 6:30p.m., mientras que Meléndez fue asignado a cubrir el turno de trabajo de 5:00a.m. a 1:30p.m.

Nieves Rodríguez arguyó que Vázquez lo ha amonestado por razones falsas e injustificadas, relacionadas a alegadas mofas de su parte en contra de otros empleados. Además, señaló que Vázquez le informó que se había abierto una nueva posición, la cual requería tener un bachillerato universitario. Adujo que esta nueva posición absorbía los deberes y funciones que realizaba y que fue creada con el fin de despedirlo por motivo de sus quejas acerca de sus términos y condiciones de trabajo, ya que tanto el director de Clorox como Vázquez, tenían conocimiento de que este no contaba con estudios universitarios. Argumentó que las actuaciones anteriormente descritas constituyen represalia, por motivo de sus actividades

protegidas y de sus quejas acerca de sus términos y condiciones de trabajo, en violación a la *Ley contra el Despido Injusto o Represalias a todo Empleado por Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial,* Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, 29 LPRA sec. 194b *et seq.* (Ley Núm. 115-1991). Por ello, solicitó que se declarara Ha Lugar la *Querella* incoada y se le ordenara a Clorox a compensarlo por la cantidad reclamada, así como la cantidad adicional correspondiente por concepto de honorarios de abogado.

Por su parte, el 19 de abril de 2024, Clorox presentó su *Contestación a Querella.*[2] En esencia, negó las alegaciones esbozadas en su contra. Aseguró que, desde el 1 de julio de 2019, Nieves Rodríguez ocupa la posición de *group leader* asignado al Plant Distribution Center (PDC). Afirmó que, el 12 de febrero de 2024, se le comunicó a Nieves Rodríguez, así como a los tres (3) empleados que ocupan la posición de PDC Warehouse Operators que, por motivo del ritmo de la producción, se iba a implementar un *cross training* para adiestrar a los tres (3) PDC Warehouse Operators en tareas de Stock Transport Order (STO) y facturación a los clientes que recogen sus productos en la planta. Aclaró que se le informó a Nieves Rodríguez que el *cross training* era temporero y que el mismo se iba a llevar a cabo desde marzo de 2024 hasta el 29 de abril de 2024 y que, durante el mismo, los empleados de PDC estarían rotando sus turnos cada dos (2) semanas, así como sus funciones. Indicó que el *cross training* se implementó con el único propósito de que los PDC Warehouse Operators pudieran ejecutar tareas de STO y facturación cuando Nieves Rodríguez se encontrara ausente o haya completado su turno de trabajo. Sostuvo que ningún empleado del PDC absorbió funciones de otro y que Nieves Rodríguez retornó

---

[2] Entrada Núm. 6 del Caso Núm. PO2024CV00916 en el SUMAC.

a sus mismas funciones y horario a partir del 29 de abril de 2024, día en que terminó el *cross training*. No obstante, indicó que las funciones que Nieves Rodríguez realizó, durante los meses de marzo y abril de 2024, forman parte de las responsabilidades claves de su posición de *group leader,* conforme se desprende de la descripción del puesto.

Por otra parte, Clorox alegó en su escrito que Vázquez no amonestó disciplinariamente a Nieves Rodríguez, sino que le sugirió evitar hacer comentarios que no se refieran a lo laboral para así evitar malentendidos con otros empleados. Además, sostuvo que, el 15 de marzo de 2024, se publicó internamente la posición de Warehouse RP PDC Coordinator. Aclaró que dicha posición conlleva mayores responsabilidades que las de *group leader* y requiere un Bachillerato en Administración de Empresas. Asimismo, adujo que la posición de Warehouse RP PDC Coordinator no absorbe las funciones ni responsabilidades de la posición de *group leader*, por lo que la posición que ocupa Nieves Rodríguez en PDC, no se eliminó ni se contempló despedir a este. Asimismo, Clorox alegó que Nieves Rodríguez no tiene derecho a los remedios solicitados ya que no ha sufrido daños económicos ni ha dejado de devengar salarios a raíz del *cross training*. En vista de lo anterior, solicitó que se declarara No Ha Lugar la *Querella* incoada por la parte apelante y se desestimara la misma con perjuicio.

Luego de varias incidencias procesales, el 1 de octubre de 2025, Clorox presentó una *Moción de Sentencia Sumaria*.[3] En

---

[3] Apéndice del recurso, págs. 1-485. Junto a su moción, la parte apelada presentó los siguientes documentos: (1) copia de la *Deposición* de Ángel Luis Nieves Rodríguez, con fecha del 25 de septiembre de 2024; (2) copia de carta dirigida a Ángel Luis Nieves Rodríguez, con fecha del 10 de abril del 2006; (3) copia de memorando sobre cambio de puesto actual dirigido a Ángel Luis Nieves Rodríguez, con fecha del 28 de mayo de 2019; (4) copia *de Horario de Trabajo para Empleado no Exento de Producción* dirigido a Ángel Luis Nieves Rodríguez, con fecha del 14 de febrero de 2018; (5) copia de *Formulario de Notificación de Horarios de Trabajo para Empleados de Producción*, con fecha del 16 de septiembre de 2022; (6) copia de memorandos dirigidos a Ángel Luis Nieves Rodríguez, con fechas del 30 de julio de 2019, 4 de octubre de 2011, 19 de diciembre de 2011, 18 de mayo de 2006;

síntesis, planteó que, desde el 2013 hasta el presente, Nieves Rodríguez ha ocupado la posición de *group leader*. Asimismo, indicó que, el 28 de mayo de 2019, Nieves Rodríguez fue trasferido a trabajar en el PDC y, desde el 2022 hasta el presente, se mantiene trabajando un primer turno con un horario de 5:00a.m. a 1:30p.m.

---

(7) copia de certificación de haber recibido la descripción de puesto de la posición de *group leader*, con fecha del 28 de mayo de 2019; (8) copia de la descripción del puesto de *group leader*, con fecha del 13 de mayo de 2019; (9) copia de carta dirigida a Ángel Luis Nieves Rodríguez, con fecha del 27 de octubre de 2023; (10) copia del *Manual del Empleado*; (11) copia de la *Divulgación del Manual de Empleados*, con fecha del 20 de julio de 2015; (12) copia del *Certificado de Culminación*, con fecha del 28 de julio de 2010; (13) copia del *Récord de Adiestramiento*, con fecha del 8 y 9 de septiembre de 2010; (14) copia del *Récord de Adiestramiento*, con fecha del 27 de enero de 2012; (15) copia del *Certificado de Culminación*, con fecha del 16 de abril de 2013; (16) copia del *Certificado de Culminación*, con fecha del 22 de febrero de 2017; (17) copia del *Certificado de Culminación*, con fecha del 3 de diciembre de 2019; (18) copia del *Certificado de Entrenamiento*, con fecha del 10 de junio de 2020; (19) copia de evidencia del cumplimiento de los requisitos del curso de PSO-GEN-0098 Entrenamiento a los Miembros del Pilar de Seguridad; (20) copia del *Registro de Asistencia*, con fecha del 5 de marzo de 2021; (20) copia del *Programa de Control de Energías Peligrosas*, con fecha del 3 de mayo de 2021; (21) copia de *Hoja de Auditoria Anual Procedimiento de Bloqueo*, con fecha del 17 de agosto de 2021; (22) copia de *Registro de Asistencia*, con fecha del 23 de agosto de 2021; (23) copia de *Registro de Asistencia,* con fecha del 23 de agosto de 2021; (24) copia de los Procedimientos de Equipos-LOTO-Nueva Revisión; (25) copia del *Certificado de Entrenamiento*, con fecha del 31 de agosto de 2021; (26) copia del *Registro de Asistencia*, con fecha del 19 de marzo de 2024; (27) copia del *Programa de Control de Energías Peligrosas*, con fecha del 19 de marzo de 2024; (28) copia *del Procedimiento de Control de Energías Peligrosas*, con fecha del 5 de diciembre de 2023; (29) copia de *Evaluación de Conocimientos y Competencias para Bloqueos (Lockout)*, con fecha del 20 de marzo de 2024; (30) copia de *Evaluación de Conocimientos y Competencias Lockout*, con fecha del 27 de marzo de 2024; (31) copia de hoja de *Asignación de Candados para Bloqueos (Lockout)*, con fecha del 11 de abril de 2024; (32) copia de correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel Nieves Rodríguez, con fecha del 21 de febrero de 2024; (33) copia del *Registro de Asistencia*, con fecha del 23 de febrero de 2024; (34) copia de correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel Nieves Rodríguez, con fecha del 27 de febrero de 2024; (35) copia de correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel Nieves Rodríguez, con fechas del 4 de marzo de 2024 y 5 de marzo de 2024; (36) copia de correo electrónico emitido por Suehail Vázquez Santana dirigido a Ángel Nieves Rodríguez, con fechas del 8 de marzo de 2024, 11 de marzo de 2024, y 13 de marzo de 2024; (39) copia de certificación de haber recibido descripción del puesto de la posición de *group leader*, con fecha del 13 de marzo de 2024; (40) copia de correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel Nieves Rodríguez, con fecha del 18 de marzo de 2024; (41) copia de correo electrónico emitido por Suehail Vázquez Santana dirigido a Ángel Nieves Rodríguez, con fecha del 18 de marzo de 2024; (42) copia de la descripción del puesto de Warehouse RP PDC Coordinator; (43) copia de correo electrónico emitido por Suehail Vázquez Santana dirigido a Ángel Nieves Rodríguez, con fecha del 20 de marzo de 2024; (44) copia de correo electrónico emitido por Richard Flores dirigido a Ángel Nieves Rodríguez, con fecha del 21 de marzo de 2024; (45) copia del *Registro de Asistencia*, con fecha del 15 de abril de 2024; (46) copia de *Resume* de Ángel Luis Nieves Rodríguez; (46) copia de la *Declaración Jurada* suscrita por Natalie Álvarez Vázquez, en representación de Clorox Manufacturing Company of Puerto Rico, Inc., el 8 de enero de 2025; (47) copia del *Timecard with Payroll Report,* con fechas del 1 de enero de 2022 al 31 de diciembre de 2022; (48) copia del *Timecard with Payroll Report*, con fechas del 1 de enero de 2023 al 31 de diciembre de 2023; (49) copia de los apuntes en cuanto a las inquietudes de Ángel Luis Nieves Rodríguez, con fecha del 29 de febrero de 2024; (50) copia del *Timecard with Payroll Report*, con fechas del 1 de enero de 2024 al 5 de abril de 2024; (51) copia del *Resume* de Victoria Dorado. Véase, Apéndice del recuro, págs. 1-485.

Indicó que, según la descripción del puesto de la posición de *group leader* que recibió Nieves Rodríguez cuando fue trasferido al PDC, el *group leader* se encarga de coordinar las actividades relacionadas al recogido, carga, y descarga de contenedores de producto terminado; transferencia de productos entre los centros de distribución; y cumplimiento con los estándares de seguridad, así como con el operativo en el área de almacén. Afirmó que Nieves Rodríguez no tiene, ni ha tenido en el pasado, empleados bajo su supervisión debido a que su puesto no es uno gerencial y no tiene responsabilidades de supervisión. Alegó que, el 12 de febrero de 2024, Vázquez le informó a los empleados del PDC que se iba a llevar a cabo un *cross training*, con el propósito de que todos los empleados del PDC pudieran ejercer las funciones de STO y facturación, para que de esta manera no se paralizara el flujo de materiales y productos en el PDC. Sobre este particular, explicó que solo dos (2) empleados, incluyendo a Nieves Rodríguez, estaban adiestrados en el proceso de STO y facturación a clientes y que los mismos estaban asignados al primer turno de 5:30 a.m. a 1:30p.m., por lo que todos los camiones que llegaban al PDC, luego de haberse terminado el primer turno, no podían ser despachados y se tenían que quedar en el PDC hasta el día siguiente.

Clorox añadió que el proceso de rotaciones y adiestramientos de los empleados del PDC duró seis (6) semanas, desde el 11 de marzo de 2024 hasta el 26 de abril de 2024 y que, durante el mismo, todos los empleados de PDC rotaron sus turnos y horarios cada dos (2) semanas, así como sus funciones. Además, indicó que, durante todo el proceso del *cross training,* Clorox atendió de forma oportuna las inquietudes de Nieves Rodríguez mediante reuniones y comunicaciones con Vázquez; Natalie Álvarez (Álvarez), HR Analyst de Clorox; y el Sr. Richard Flores (Flores), Gerente de la Planta de Clorox. Aclaró que, durante el periodo de rotaciones, Nieves

Rodríguez únicamente trabajó un turno distinto al suyo en dos (2) ocasiones, a saber: la semana del 11 al 18 de marzo y la del 8 al 19 de abril de 2024 y que el resto del tiempo trabajó su turno regular de 5:00a.m. a 1:30p.m. Asimismo, adujo que, como parte del *cross training*, los turnos por los que rotó Nieves Rodríguez requirieron que este operara un montacarga con más frecuencia. Ahora bien, adujo que dichas funciones eran parte de las responsabilidades claves de su posición de *group leader*, conforme la descripción del puesto y que, durante todo el proceso del *cross training*, Nieves Rodríguez mantuvo su posición de *group leader*.

Por otro lado, Clorox adujo que Nieves Rodríguez no fue amonestado por razones injustificadas. Indicó que Vázquez le envió un correo electrónico en el que le indicó que recibió unas quejas, de parte de un empleado, debido a unos comentarios que hizo y le sugirió que evitara comentarios que no sean del trabajo para evitar malentendidos. Arguyó que, aparte de dicho correo electrónico, Nieves Rodríguez no recibió ninguna amonestación ni fue disciplinado. Por otra parte, el 14 de marzo de 2024, se publicó internamente la posición de Warehouse RP PDC Coordinator. Alegó que, según se desprende de la descripción del puesto, dicha posición no absorbió funciones ni responsabilidades de la posición de *group leader* que ocupaba Nieves Rodríguez en PDC. Aclaró que la posición de Warehouse RP PDC Coordinator era una posición distinta a la de *group leader* ya que incluía responsabilidades de supervisión de otros empleados. Además, indicó que, dentro de los requisitos mínimos de la posición de Warehouse RP-PDC Coordinator, se encontraba tener un bachillerato universitario y un mínimo de tres (3) años de experiencia en administración de almacenes, operaciones y supervisión. Afirmó que, a pesar de que Nieves Rodríguez entendía que cumplía con los requisitos para ocupar dicha posición, lo cierto es que Nieves Rodríguez no poseía estudios

universitarios ni la experiencia necesaria, ya que la única experiencia de trabajo que tenía era como *group leader* y, anteriormente, como operador de almacén. Alegó que, en su consecuencia, Nieves Rodríguez no podía ser considerado para dicha posición, por lo que Victoria Dorado fue seleccionada para ocupar el puesto debido a su formación académica como Ingeniera Industrial y por contar con una Maestría en Administración y Dirección de Empresas, así como una especialización en logísticas integradas y una trayectoria profesional de más de quince (15) años en roles de supervisión de almacenes. No obstante, reiteró que Nieves Rodríguez permaneció siendo empleado de Clorox, y que, todos los empleados del PDC, incluyendo Nieves Rodríguez, regresaron a sus respectivos turnos y funciones el 29 de abril de 2024, día en que culminó el *cross training*.

Por lo antes expuesto, Clorox afirmó que Nieves Rodríguez no puede establecer un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra,* ya que los términos y condiciones de su empleo han permanecido inalterados. Asimismo, alegó que Nieves Rodríguez no cuenta con prueba alguna que demuestre que este fue despedido, amenazado o discriminado a raíz de sus quejas, ni puede establecer una relación causal. Por lo tanto, solicitó que se dictara sentencia sumaria desestimando la *Querella* incoada por Nieves Rodríguez.

En desacuerdo, el 20 de febrero de 2020, Nieves Rodríguez se opuso.[4] En esencia, arguyó que existe controversia en cuanto a si

---

[4] Entrada Núm. 29 del Caso Núm. PO2024CV00916 en el SUMAC. Junto a su moción, la parte apelante presentó los siguientes documentos: (1) copia de la *Deposición* de Ángel Luis Nieves Rodríguez, con fecha del 25 de septiembre de 2024; (2) copia de correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel Nieves Rodríguez, con fecha del 27 de febrero de 2024; (3) copia de correo electrónico emitido por Ángel Nieves Rodríguez dirigido a Natalie Álvarez Vázquez, con fecha del 4 de marzo de 2024 y 8 de marzo de 2024; (3) copia de correo electrónico emitido por Suehail Vázquez Santa dirigido a Ángel Nieves Rodríguez, con fecha del 8 de marzo de 2024 (4) copia de correo electrónico emitido por Ángel Nieves Rodríguez dirigido a Suehail Vázquez Santa, con fecha del 11 de marzo de 2024; (5) correo electrónico emitido por Natalie Álvarez Vázquez dirigido a Ángel

Clorox tomó acciones adversas en su contra, entre estas, el cambio de turno de trabajo; acciones disciplinarias por razones falsas e injustificadas; y la eliminación de sus funciones. Además, indicó que es un hecho en controversia si dichas acciones afectaron sus términos y condiciones de empleo, creando un ambiente hostil de trabajo. Asimismo, adujo que la alegación de Clorox de que Nieves Rodríguez no sufrió ningún cambio en cuanto a sus deberes y funciones, como consecuencia del *cross training*, es un hecho material que está en controversia. Sobre este particular, explicó que realizaba funciones adicionales que no formaban parte de las responsabilidades claves de un *group leader*, tales como asistir a las reuniones diarias relacionadas a las operaciones del almacén; supervisar a los empleados que ocupaban la posición de PDC Warehouse Operator; y ayudar en la preparación de los horarios de trabajo de los empleados del almacén, así como en la evaluación de desempeño de estos. Sostuvo que dichas funciones le fueron eliminadas luego de que presentó las quejas acerca de sus términos y condiciones de trabajo. Por tal razón, alegó que, aunque retornó a sus mismas funciones y horario una vez culminó el *cross training*, Vázquez le quitó todos sus deberes y le asignó las funciones de un operador de almacén, lo que constituyó una degradación de su posición.

Por otra parte, Nieves Rodríguez planteó, en su oposición, que existe controversia en cuanto a si este sufrió una acción adversa por motivo de no ser seleccionado para ocupar la posición de Warehouse RP-PDC Coordinator. Sostuvo, además, que hay controversia en cuanto a si la posición de Warehouse RP-PDC Coordinator implicaba unos deberes y funciones diferentes a los que realizaba como *group*

---

Nieves Rodríguez, con fecha del 18 de marzo de 2024; (6) copia de correo electrónico emitido por Suehail Vázquez Santa dirigido a Ángel Nieves Rodríguez, con fecha del 18 de marzo de 2024; copia de correo electrónico emitido por Richard Flores, con fecha del 21 de marzo de 2024.

*leader*. Alegó que la posición de Warehouse RP-PDC Coordinator implicaba las mismas responsabilidades que realizaba como *group leader*. Entre estas, la supervisión diaria de empleados y la administración de las operaciones del almacén incluyendo: la carga, descarga, recogido y facturación de contenedores; transferencia de productos entre los almacenes; cumplimiento con los estándares de seguridad; y la operación del *palletizer*. Asimismo, Nieves Rodríguez planteó que existe controversia en cuanto a si los requisitos mínimos de la posición de Warehouse RP-PDC Coordinator, entre los cuales se encontraba tener un bachillerato universitario, fueron creados con el propósito de descalificarlo para ocupar la posición, ya que Clorox tenía conocimiento de que este no contaba con estudios universitarios. Por otra parte, argumentó que existe controversia en cuanto a si no fue seleccionado para ocupar la posición de Warehouse RP-PDC Coordinator por motivo a la *Querella* incoada por este. Sobre este particular, explicó que, a pesar de que no poseía estudios universitarios, contaba con la experiencia y los requisitos necesarios para ocupar la posición de Warehouse RP-PDC Coordinator y que dicha posición fue publicada diez (10) días después de la primera queja de Nieves Rodríguez del 4 de marzo del 2024.

Nieves Rodríguez alegó, además, que existe una proximidad temporal entre las quejas que presentó en contra de Vázquez y las acciones adversas tomadas en su contra. Señaló que, lo anterior, crea la inferencia de que las acciones adversas en su contra fueron tomadas en represalia por sus quejas, acerca de sus términos y condiciones de trabajo, y la radicación de la *Querella* de epígrafe, en violación a la Ley Núm. 115-1991, *supra*. Indicó que ha establecido todos los elementos para presentar un caso de represalias bajo Ley Núm. 115-1991, *supra*, y que los hechos materiales con

respecto a la misma están en controversia. Por lo tanto, solicitó que se declarara No Ha Lugar la *Moción de Sentencia Sumaria* promovida por Clorox.

Evaluadas las posturas de las partes, incluyendo los memorandos de derecho presentados por estas, el 2 de abril de 2025, notificada el 4 del mismo mes y año, el Tribunal de Primera Instancia emitió la *Sentencia* que nos ocupa.[5] En esta, desglosó las siguientes determinaciones de hechos:

### Empleo del Sr. Nieves con Clorox

1. El Sr. Nieves comenzó a trabajar como empleado regular de Clorox el 24 de abril de 2006 en la posición de Operador en el almacén de Clorox ubicado en el Bo. Río Cañas, Sector La Changa en Caguas.

2. Desde el 2013 hasta el presente, el Sr. Nieves ha ocupado la posición de *group leader*.

3. El 28 de mayo de 2019, el Sr. Nieves fue trasferido a trabajar en el Plant Distribution Center (PDC) debido a unos cambios organización[al]es en la Compañía.

4. Desde el 2022 hasta el presente, el Sr. Nieves trabaja un horario de 5:00 a.m. a 1:30 p.m.

5. En el PDC trabajan otros empleados de Clorox que ocupan la posición de PDC Warehouse Operator: Alexander Meléndez, Jerry Rivera y Miguel Vega.

6. En el PDC, el Sr. Nieves y los PDC Warehouse Operators eran supervisados por la Sra. Suehail Vázquez, quien ocupaba la posición de Business Support Leader.

7. Desde el 29 de octubre de 2023 hasta el 26 de octubre de 2024, el Sr. Nieves tuvo un salario de $19.02 por hora.

8. En el PDC, el Sr. Nieves siempre ha trabajado un mínimo de cuarenta (40) horas semanales.

### Funciones y Responsabilidades de un *group leader*

9. La Descripción de Puesto de la posición de *group leader* que recibió el Sr. Nieves el 28 de mayo de 2019 cuando se transfirió al PDC, indica que el *group leader* coordina todas las actividades relacionadas a los procesos de recogido (*picking*), carga y descarga de contenedores de producto terminado, transferencia de productos entre DC, coordina el mantener cumplimiento con los estándares de seguridad y el cumplimiento operativo en el área de almacén.

---

[5] Entrada Núm. 37 del Caso Núm. PO2024CV00916 en el SUMAC.

10. La Descripción de Puesto de *group leader* identifica las siguientes responsabilidades clave[s] de la posición, así como el porcentaje de tiempo que se le dedica a cada responsabilidad, a saber:

| Responsabilidad Clave | Porcentaje de Tiempo |
|---|---|
| 1. Responsable por la coordinación de tareas operacionales tales como recibos, despachos o "pickings", manejo del palletizer HSL, transferencias de productos en los almacenes del DC. | 20% |
| 2. Responsable por mantener los estándares de seguridad y de orden y limpieza del área de almacén. Además, de coordinar con el Supervisor que se ejecuten las actividades de AM (mantenimiento autónomo) asignadas al Palletizer de HSL según requerido. | 15% |
| 3. Asistir en el control y manejo del inventario. Participar en los conteos cíclicos e inventarios físicos. | 15% |
| 4. Responsable de realizar requisiciones de compra y recibir facturas en SAP según sea requerido. Recibir STO de transferencia de inventario de ser necesario. | 10% |
| 5. Responsable de la operación adecuada de los equipos y sistemas del área, solicitar reparaciones según aplique. | 10% |
| 6. Cargar y descargar mercancía de vagones y/o camiones utilizando equipo industrial motorizado o manualmente y completar la documentación requerida. | 10% |
| 7. Responsable por el recibo de producto retornado y coordinar el proceso de reacondicionamiento de producto regresado "damages". | 5% |
| 8. Responsable de coordinar que los operadores verifiquen correctamente e inspeccionen las condiciones del equipo industrial motorizado y coordinar el mantenimiento correctivo/preventivo necesario. | 5% |
| 9. Asistir al Supervisor en el control de paletas, reportando lo recibido y enviando en la documentación requerida. Proveer adiestramiento a nuevos empleados en el área. | 5% |
| 10. Coordinar retrabajos de producto terminado con los operadores de almacén según sea necesario para minimizar la pérdida de producto. Asegurar que se complete la hora de solicitud de materiales para retrabajo y se entregue al Coordinador de Inventario, o designado. | 5% |

11. La Descripción de Puesto de la posición de *group leader* no indica que sea responsable de supervisar a otros empleados.

12. El *group leader* no asigna horarios de trabajo a otros empleados, no evalúa el desempeño de otros empleados, no disciplina a otros empleados, ni hace recomendaciones de salarios y bonificaciones, según también admitió el Querellante.

13. La posición de *group leader* tiene un nivel jerárquico de "18" lo que implica que no es una posición gerencial ni supervisa.

**Políticas y Procedimientos de Clorox**

14. El Sr. Nieves recibió copia de las normas y políticas de la Compañía, así como las revisiones de las políticas, y conoce las mismas.

15. Dentro de las políticas que recibió el Sr. Nieves se encuentra el Manual de Empleados.

16. El Manual de Empleados de Clorox tiene una sección intitulada "Manejo de Situaciones y Política de Puertas Abiertas". Dicha sección contiene un procedimiento de quejas y agravios para que los empleados presenten quejas y preocupaciones relacionadas a sus funciones, condiciones de trabajo o cualquier otro asunto relacionado con su empleo.

17. El Manual de Empleados de Clorox tiene una sección intitulada "Horario de Trabajo" donde dispone que "[l]a jornada regular diaria de trabajo de cada empleado se establecerá por su supervisor conforme a las necesidades operacionales de la Compañía. La misma puede variar de tiempo en tiempo de acuerdo a dichas necesidades".

**Rotación Temporera Anterior al *cross training* de Marzo y Abril 2024**

18. En enero de 2024, la Sra. Suehail Vázquez notificó a los empleados de PDC un proceso de rotaciones de turnos que duró aproximadamente dos (2) semanas y afectó a todos los empleados del PDC.

19. Durante el proceso de rotaciones de turnos en enero de 2024, el Sr. Nieves no tuvo un cambio de horario toda vez que otro empleado del PDC acordó cubrir los turnos rotativos que se asignaron al Sr. Nieves durante esas dos (2) semanas.

20. El Sr. Nieves declaró durante su deposición que se reunió "de pasillo" con su supervisora, la Sra. Vázquez, en o alrededor de enero de 2024, para indicarle que no podía trabajar otro turno que no fuese el turno de 5:00 a.m. a 1:30 p.m., y la Sra. Vázquez no hizo ningún comentario, aunque lo miró "con cara de que no [le] importa".

**Programa de *cross training* de Marzo y Abril 2024**

21. El procedimiento de Stock Transfer Order (STO) se utiliza para hacer una transferencia de mercancía del PDC a otro almacén externo (DHL).

22. A principios del 2024, los únicos empleados del PDC que estaban adiestrados en el proceso de STO eran el Sr. Jerry Rivera, quien ocupaba la posición de PDC Warehouse Operator, y el Sr. Nieves. Los otros dos (2) empleados que ocupaban la posición de PDC Warehouse Operator, Alexander Meléndez y Miguel Vega, no estaban adiestrados en el procedimiento de STO.

23. El Sr. Jerry Rivera y el Sr. Nieves estaban ambos asignados al turno de 5:00 a.m. a 1:30 p.m.

24. El PDC continuaba operando luego de terminado el primer turno (5:30 a.m.-1:30 p.m.) y continúa recibiendo camiones para despachar.

25. A principios del 2024, los PDC Warehouse Operators que entraban a trabajar al PDC al turno de la 1:30 p.m., no estaban adiestrados en el STO y no podían completar el proceso para transferir mercancía fuera del PDC. Por consiguiente, todos los camiones que llegaban al PDC luego de la 1:30 p.m. no podían ser despachados con productos y se tenían que quedar en el PDC hasta el día siguiente.

26. De igual forma, a principios del 2024, no habían empleados en el PDC que pudieran ejercer la facturación a clientes que recogían productos luego de la 1:30 p.m.

27. El 12 de febrero de 2024, la Sra. Suehail Vázquez le informó a todos los empleados del PDC que se iban a llevar a cabo unos adiestramientos y rotaciones de turnos en Marzo y Abril 2024, con el propósito de que todos los empleados del PDC pudieran ejercer las funciones de STO y facturación.

28. El propósito de estos adiestramientos (*cross training*) y las rotaciones era que todos los PDC Warehouse Operators pudieran ejecutar las tareas de STO y facturación para que cuando el Sr. Nieves o el Sr. Jerry Rivera estuvieran ausentes o completaran su turno de trabajo, no se paralizara el flujo de materiales y productos en el PDC.

29. El *cross training* fue un proceso temporero que duró seis (6) semanas, desde marzo de 2024 hasta el 29 de abril de 2024, y durante el mismo, los empleados de PDC rotaron turnos y funciones cada dos (2) semanas.

30. Durante el *cross training* de marzo y abril 2024, el Sr. Nieves rotó turnos en el PDC que le requirieron operar un montacarga para cargar y descargar mercancía de vagones y/o camiones de manera más

frecuente. Esta era una responsabilidad clave del *group leader*, según dispone la Descripción de Puesto.

**Clorox atendió prontamente todas las preocupaciones y dudas del Sr. Nieves en cuanto al *cross training* y su descripción de puesto**

31. El 29 de febrero de 2024, el Sr. Nieves tuvo una reunión con la Sra. Álvarez Vázquez donde expresó sus preocupaciones con respecto a los cambios y las rotaciones que se iban a llevar a cabo en el PDC, mientras la Sra. Álvarez-Vázquez tomaba notas.

32. El Sr. Nieves le expresó a la Sra. Alvarez-Vázquez, entre otras cosas, que no estaba de acuerdo con los cambios de turnos por el *cross training*; que le preocupaba la descripción de su puesto y no poder realizar esas tareas durante el *cross training*; que le preocupaba que le dieran un puesto nuevo a otra persona; y que habían "rumores" y "chismes de área".

33. El 4 de marzo de 2024, el Sr. Nieves le escribió un correo electrónico a la Sra. Álvarez-Vázquez mediante el cual le explicó nuevamente sus preocupaciones en torno a los cambios que estaban sucediendo y solicitó una copia de su descripción de puesto. En su correo electrónico, el Sr. Nieves indicó que no estaban tomando en consideración sus funciones de *group leader* ya que se impartían instrucciones sin haberlas "reportado" a él directamente. También, el Sr. Nieves incluyó un *screen shot* de un mensaje de WhatsApp en el que la Sra. Suehail Vázquez notificaba a todos los empleados del PDC cuándo empezarían a rotar y el orden en el cual estarían rotando.

34. El 5 de marzo de 2024, la Sra. Álvarez-Vázquez le envió un correo electrónico al Sr. Nieves donde anejó copia de la descripción de su puesto de *group leader*.

35. El 6 de marzo de 2024, el Sr. Nieves se reunió con el Plant Manager, Sr. Richard Flores, y luego le escribió el siguiente correo electrónico a la Sra. Suehail Vázquez:

> Me comunico por este medio para notificar que, aunque tuvimos nuestra conversación el lunes 4 de marzo de 2024 con el cambio de horario donde mis funciones como *group leader* se iban a afectar o dejaría de ejercerse en un periodo de dos semanas, me indicó que tendría contestación el miércoles por escrito pero las instrucciones fueron dadas hoy 8 de marzo de 2024 de manera verbal donde permanece igual el horario (10:00am-6:30pm) teniendo en sí ningún cambio al respecto con lo dialogado el lunes.

36. El 8 de marzo de 2024, la Sra. Suehail Vázquez le escribió un correo electrónico al Sr. Nieves mediante el cual le envió una minuta en torno a lo que discutió con el Sr. Nieves durante la reunión del 4 de marzo de 2024.

37. Entre los temas descritos en la minuta del 4 de marzo, se encontraban que la Sra. Suehail Vázquez recibió unas quejas de parte de un compañero de trabajo del Sr. Nieves por unos comentarios que él mismo hizo, por lo que la Sra. Vázquez le sugirió al Sr. Nieves que evitara comentarios que no sean del trabajo para evitar malentendidos.

38. Aparte de la sugerencia de no hacer comentarios que no se refieran al trabajo para así evitar malentendidos con otros empleados, el Sr. Nieves no recibió ninguna amonestación ni fue disciplinado.

39. El 8 de marzo de 2024, la Sra. Suehail Vázquez le escribió otro correo electrónico en respuesta al correo electrónico al Sr. Nieves en donde le confirmó que las funciones del Sr. Nieves como *group leader* se quedaban igual y que ella (Sra. Suehail Vázquez) podía discutir con el Sr. Nieves su descripción de puesto para que no le quedaran dudas, entre otros asuntos.

40. En el correo electrónico del 8 de marzo de 2024, la Sra. Suehail Vázquez le indicó al Sr. Nieves que las rotaciones de turnos iban a ser temporeras hasta que se completaran los adiestramientos, repasó las rotaciones que se iban a llevar a cabo y le solicitó al Sr. Nieves que le indicara si existía alguna situación que le impidiera poder cumplir con los horarios temporeros de las rotaciones para así entender cómo poder ayudarlo.

41. El 13 de marzo de 2024, la Sra. Suehail Vázquez se reunió con el Sr. Nieves para repasar su descripción de puesto. Durante la reunión, la Sra. Suehail Vázquez le recordó al Sr. Nieves que su rol como *group leader* era de coordinación de actividades y no era de supervisión de personal.

42. El 14 de marzo de 2024, el Sr. Nieves nuevamente le envió otro correo electrónico a la Sra. Suehail Vázquez, con copia a la Sra. Natalie Álvarez Vázquez y el Sr. Richard Flores, donde hizo una serie de preguntas en torno a su descripción de puesto.

43. El 18 de marzo de 2024, el Sr. Nieves se reunió con la Sra. Natalie Álvarez Vázquez y el Sr. Richard Flores. Durante la reunión, la Sra. Álvarez-Vázquez tomó una serie de notas y, posteriormente, preparó una minuta sobre lo que se discutió durante la reunión.

44. Ese mismo día, 18 de marzo de 2024, la Sra. Álvarez-Vázquez le envió un correo electrónico a la Sra. Greta Rubio-Estrada, de *Employee Relations*, e incluyó la minuta de su reunión con el Sr. Nieves y el Sr. Richard Flores durante la cual el Sr. Nieves hizo comentarios de que sentía que estaba siendo *gaslighted*, manipulado y/o desplazado en el trabajo. Los comentarios del Sr. Nieves fueron referidos al departamento de *Employee Relations* de Clorox para ser investigados.

45. El 19 de marzo de 2024, según había sido solicitado por el Sr. Nieves, el Sr. Nieves fue readiestrado en el proceso de LOTO.

46. El 21 de marzo de 2024, el Sr. Nieves se reunió con la Sra. Greta Rubio Estrada de *Employee Relations*, quién, luego de escuchar sus mismas preocupaciones y planteamientos, le explicó al Sr. Nieves que no configuraban un *gaslighting*.

47. El Sr. Nieves admitió que ningún empleado de Clorox le faltó el respeto durante los múltiples intercambios de correos electrónicos y las distintas reuniones que sostuvo en las que se discutieron sus preocupaciones acerca del *cross training* y sus funciones.

### Fin del *cross training* en Abril 2024

48. El proceso de rotaciones y adiestramientos de los empleados del PDC duró seis (6) semanas, del 11 de marzo de 2024 hasta el 26 de abril de 2024.

49. Los empleados del PDC, incluyendo el Sr. Nieves, regresaron a sus respectivos turnos de trabajo a partir del 29 de abril de 2024.

50. Durante el periodo de rotaciones del 11 de marzo de 2024 hasta el 26 de abril de 2024, el Sr. Nieves únicamente trabajó otro turno en dos ocasiones, a saber: en la semana del 11 de marzo al 18 de marzo y en la semana del 8 de abril al 19 de abril. El resto del tiempo, el Sr. Nieves trabajó su turno regular de 5:00 a.m. a 1:30 p.m.

51. Mediante el proceso de adiestramientos (*cross training*) y rotaciones del PDC, el Sr. Alexander Meléndez, PDC Warehouse Operator, fue adiestrado en los procesos de STO y facturación a clientes, mientras que el Sr. Miguel Vega fue adiestrado parcialmente en los procesos de STO y facturación de clientes.

52. Luego del (*cross training*), el Sr. Meléndez podía ejercer los procesos de STO y facturación a clientes si el Sr. Nieves y/o el Sr. Jerry Rivera no estaban presentes. De igual forma, luego de que el Sr. Vega completara sus adiestramientos, éste también podría ejercer las funciones de STO y facturación a clientes, cuando el Sr. Nieves y/o el Sr. Jerry Rivera no estuvieran presentes.

53. Durante los adiestramientos (*cross training*) y rotaciones, el Sr. Nieves mantuvo su posición de *group leader*, así como su salario de $19.02 por hora con cuarenta (40) horas semanales de trabajo.

### La nueva posición de Warehouse RP-PDC Coordinator

54. El 14 de marzo de 2024, Clorox publicó internamente la descripción de puesto de una nueva posición titulada Warehouse RP-PDC Coordinator.

55. La posición de Warehouse RP-PDC Coordinator era una posición de nueva creación que incluía mayores responsabilidades que los de *group leader*, incluyendo la de supervisión de otros empleados, y estaba catalogada como una posición nivel "23", lo cual era un nivel jerárquico mayor al del *group leader*. La posición de Warehouse RP-PDC Coordinator supervisaría al *group leader*, y los Warehouse Operators a los empleados de materiales, y se reportaría al Plant Operation Leader.

56. La posición de Warehouse RP-PDC Coordinator requería tener un bachillerato universitario y un mínimo de tres (3) años de experiencia en administración de almacenes, operaciones y supervisión.

57. El 19 de marzo de 2024, el Sr. Nieves solicitó para la posición de Warehouse RP-PDC Coordinator.

58. El grado más alto de preparación académica que había obtenido el Sr. Nieves era de cuarto año de escuela superior.

59. Al momento de solicitar la nueva posición de Warehouse RP-PDC Coordinator, la experiencia de trabajo que tenía el Sr. Nieves era con Clorox, en la posición de *group leader*, y anteriormente la posición de *Picker*, donde no tenía funciones de administración y/o supervisión de empleados.

60. El Sr. Nieves quedó descalificado de la posición de Warehouse RP-PDC Coordinator porque no cumplía con los requisitos mínimos para ocupar dicha posición.

61. La Sra. Victoria Dorado fue seleccionada y el 3 de junio de 2024, comenzó a trabajar en Clorox en la nueva posición de Warehouse RP-PDC Coordinator. Por consiguiente, el Sr. Nieves pasó a ser supervisado por la Sra. Dorado.

62. La Sra. Victoria Dorado es Ingeniera Industrial y tiene una Maestría en Administración y Dirección de Empresas (MBA), así como una especialización en logísticas integradas. Previo a trabajar para Clorox, la Sra. Dorado ocupó posiciones de Warehouse Coordinator, Warehouse Supervisor y Head of Maintenance and Inventory Planning, y contaba con sobre quince (15) años de experiencia en administración de almacenes, operaciones y supervisión.

### El Sr. Nieves continúa trabajando en Clorox en la posición de *group leader*

63. Luego del *cross training* y rotaciones hasta el presente, el Sr. Nieves continuó trabajando en su posición de *group leader*, con las mismas funciones que ejerce desde el 2019. Es decir, las funciones del Sr. Nieves no desaparecieron, ni fueron absorbidas por ningún otro empleado.

64. El Sr. Alexander Meléndez continúa trabajando en Clorox ejerciendo funciones de la posición de Warehouse Operator.

65. El 27 de octubre de 2024, el Sr. Nieves recibió un aumento de salario.

El foro primario expresó que, a pesar de que Nieves Rodríguez sostuvo que le eliminaron sus funciones de supervisión y que las mismas no le fueron devueltas, luego de culminado el *cross training*, lo cierto es que, según la descripción del puesto de *group leader*, este no tenía las funciones de asignar horarios a otros empleados; evaluar el desempeño de otros empleados; disciplinar a otros empleados; ni hacer recomendaciones de salarios y bonificaciones. Dispuso que, más bien, quedó establecido que las responsabilidades del *group leader* están centradas en la coordinación de las actividades del PDC relacionadas a los procesos de recogido, carga y descarga de contenedores de producto terminado; transferencia de productos entre los centros de distribución; y mantener el cumplimiento con los estándares de seguridad y operativo en el área de almacén. Además, detalló que, durante la deposición de Nieves Rodríguez, este admitió que no existe una función dentro de la descripción de deberes correspondiente a la posición de "*group leader*" que no esté ejerciendo al presente en su empleo.

Por otra parte, en la determinación apelada, el foro *a quo* dispuso que, Nieves Rodríguez no estableció que la posición de Warehouse RP-PDC Coordinator absorbió sus funciones de *group leader*. Expresó, además, que dentro de los requisitos mínimos de la posición se encontraba tener un bachillerato universitario y un

mínimo de tres (3) años de experiencia en administración de almacenes, operaciones, y supervisión. Explicó que, debido a que Nieves Rodríguez no cumplía con los requisitos mínimos, este quedó descalificado para la posición. No obstante, continuó trabajando en su misma posición de *group leader* y con los mismos deberes y funciones que le fueron asignados desde el 2019.

El foro primario concluyó, además, que Nieves Rodríguez no sufrió represalias durante su empleo con Clorox y que el mero hecho de que no estuviera de acuerdo con la decisión de Clorox de llevar a cabo un *cross training*, no es suficiente para establecer una acción protegida bajo la Ley Núm. 115-1991, *supra*. Asimismo, detalló que tampoco existen hechos que sustenten una acción adversa de su patrono ya que este no fue despedido, amenazado o discriminado a raíz de sus quejas. En consecuencia, determinó que Nieves Rodríguez carece de prueba admisible para establecer un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra*.

Inconforme, el 10 de abril de 2025, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> Erró el TPI por motivo a que realizó determinaciones de credibilidad, sobre hechos materiales, al momento de resolver la Moción de Sentencia Sumaria, y la Oposición a la misma, y adoptó como ciertos, los hechos 11-15 de la moción de sentencia sumaria relacionadas con los deberes y funciones de la posición de *Group Leader*, que Nieves realizaba, antes y después del *cross training* según estos aparecen en el *job description*, no empece a que en la Oposición, la parte apelante presentó evidencia que refutaban los mismos, por lo que el TPI err[ó], al realizar determinaciones de credibilidad y no tomar en consideración las alegaciones de Nieves en los hechos 11-15, 77 de la Oposición, relacionados con los deberes y funciones que Nieves realizaba como *Group Leader*, y que no aparecían en el *job description* de la posición, relacionados con: la supervisión de los empleados del almacén; la asignación de trabajos y funciones a los empleados del almacén; y la asistencia de Nieves, a las reuniones diarias con los gerenciales de la planta para discutir los asuntos relacionados con las órdenes de compra y entrega, operaciones, salud y seguridad del almacén, que fueron deberes y funciones que Nieves realizaba a diario, aunque no aparecen en el

*job descr[i]ption* de la posición de *Group Leader* ocupada por Nieves y le fueron removidos una vez termin[ó] el *cross training,* y que eran de suma importancia para Nieves, así como para las operaciones de la querellada-apelada.

Erró el TPI en la Sentencia dictada, en el hecho número 63, por motivo a que realiz[ó] determinaciones de credibilidad sobre hechos materiales, con respecto al hecho 77 de la moción de sentencia sumaria, de que la querellada, una vez termin[ó] el *cross training,* reinstal[ó] a Nieves a la posición que ocupaba en el almacén cuando acab[ó] el *cross training* el 26 de abril del 2024, con las mismas funciones que realizaba antes del *cross training,* de *Group Leader,* no empec[e] a que Nieves, en su oposición, en el párrafo 77, refut[ó] el hecho 77 de la moción de sentencia sumaria, y estableció que la querellada, cuando t[é]rmino el *cross training,* degrado a Nieves, y aunque lo asign[ó] a su mismo turno en el almacén, le quit[ó] sus funciones de supervisión de empleados, la asignación de tareas y funciones en el almacén, y la asistencia a las reuniones diarias con los gerenciales, y le asign[ó] funciones de operador de montacarga, lo que constituye una degradación, lo que ocurrió, por la participación de Nieves en actividades protegidas bajo la Ley Núm. 115, en específico, las quejas de Nieves del 27 de febrero del 2024; 4 de marzo del 2024; 8 de marzo del 2024; 11 de marzo del 2024; 14 de marzo del 2024; y 20 de marzo del 2024.

Erró el TPI en sus conclusiones de hechos en la Sentencia, en los párrafos 55, 59,y 60, y realizar determinaciones de credibilidad sobre hechos materiales, y concluir que la posición de *Warehouse RP-PDC Coordinator,* era una posición nueva, con unos deberes y funciones diferentes a los cuales Nieves realizaba como *Group Leader,* y que había realizado, sin ningún tipo de deficiencias, por años, y que Nieves fue descalificado por no cumplir con los requisitos de la misma, no empec[e] a que Nieves, en los párrafos 79-87 de la Oposición, estableció que las funciones de la plaza de *Warehouse RP-PDC Coordinator,* eran las mismas que Nieves había realizado por años como Group Leader, por lo que podía ocupar la posición, sin embargo, no fue seleccionado para la misma, el mismo día en que radic[ó] la Querella, por lo que la decisión de descalificar a Nieves de la posición de *Warehouse RP-PDC Coordinator,* fue en represalia por la Querella radicada, y no por motivo a que Nieves no cumplía con los requisitos de la plaza, como fue erróneamente resuelto por el TPI.

Erró el TPI en sus conclusiones en la Sentencia, de que Nieves, no sufrió ninguna acción adversa en su empleo, y no fue sometido a un ambiente hostil de trabajo, por lo que no pudo establecer un caso *prima facie* de represalias bajo la Ley Núm. 115, debido a que contrario a lo resuelto por el TPI, en la Oposición, en los párrafos 11-15, 77-87, Nieves estableció que existen controversias de hechos materiales con respecto a si

[Clorox] tom[ó] acciones adversas en contra de Nieves, entre estas: la eliminación de sus funciones de importancia y la asignación de funciones relacionadas a las de un operador de montacargas, lo cual fue una degradación, una vez concluy[ó] el cross training el 26 de abril del 2024, y el no considerar y descalificar a Nieves para ocupar la posición de *Warehouse RP-PDC Coordinator*, el mismo día en que Nieves radic[ó] su Querella, no empec[e] a que las funciones de dicha posición, eran las mismas que Nieves había realizado en la posición que ocupaba de *Group Leader*, por años, sin ningún tipo de deficiencias, las cuales fueron acciones adversas y tuvieron el efecto de afectar negativamente sus términos y condiciones de empleo y su condición emocional, y tuvieron el efecto de crear una ambiente hostil de trabajo, por motivo a las quejas de Nieves relacionadas a sus términos y condiciones de trabajo, en violación a la Ley Núm. 115, por lo que err[ó] el TPI en su conclusión de que Nieves no fue objeto de acciones adversas en su contra y que tampoco fue sometido a un ambiente hostil de trabajo, en violación a la Ley Núm. 115.

En cumplimiento con nuestra *Resolución* del 23 de abril de 2025, la parte apelada compareció mediante *Alegato en Oposición a Apelación* el 12 de mayo de 2025.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

**A**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023); *Oriental Bank v. Caballero García*, 212 DPR 671 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601 (2023); *Acevedo y otros v. Depto. Hacienda y otros*, 212 DPR 335 (2023); *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964

(2022). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra. Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García*, supra; *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019). Si la parte promovente

de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole,* 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si

bajo ningún supuesto de hechos prevalece la parte promovida. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Cruz, López v. Casa Bella y otros*, 213 DPR 80 (2024); *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra. Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, 2024 TSPR 62, resuelto el 17 de junio de 2024; *Oriental Bank v. Caballero García,* supra, pág. 7; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010). Ahora bien, el Foro de última instancia ha reiterado que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, pues debe tratarse de una incertidumbre que permita concluir que existe una controversia real sobre hechos relevantes y pertinentes. *Íd.* Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. V. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otro v. ELA y otros*, supra.

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro*, 2025 TSPR 1, resuelto el 7 de enero de 2025; *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, supra; *Birriel Colón v. Econo y otro*, 213 DPR 80 (2023); *Serrano Picón v. Multinational Life Ins.,* supra; *González Meléndez v. Mun. San Juan et al.*, supra; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra,* así como de su jurisprudencia interpretativa. *González Meléndez v. Mun. San Juan et al.*, supra. A tenor con la referida normativa, dicha revisión se realizará de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el foro de origen y realizando todas las inferencias permisibles a su favor. *Birriel Colón v. Econo y otro,*

supra; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *González Meléndez v. Mun. San Juan et al.*, supra.

**B**

La *Ley Contra el Despido Injusto o Represalias a Todo Empleado[(a)] por Ofrecer Testimonio Ante un Foro Legislativo, Administrativo o Judicial*, Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, 29 LPRA sec. 194 *et seq.* (Ley Núm. 115-1991), provee una protección para la persona empleada frente a represalias que tome un patrono contra esta por haber provisto testimonio, expresión o información en algún foro judicial, legislativo o administrativo. *Feliciano Martes v. Sheraton*, 182 DPR 368, 392 (2011); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 361 (2011); *Ocasio v. Kelly Servs.*, 163 DPR 653, 684 (2005). Es decir, la Ley Núm. 115-1191, *supra*, prohíbe que un patrono despida, amenace o discrimine contra un empleado con relación a los términos y condiciones de su empleo, incluyendo beneficios, compensación, entre otros, porque ofrezca o intente ofrecer información o testimonio ante un foro legislativo, administrativo o judicial. 29 LPRA sec. 194a(a). *Cordero Jiménez v. Universidad de Puerto Rico*, 188 DPR 129, 136 (2013); *Rentas Santiago v. Autogermana, Inc.*, 182 DPR 759, 765 (2011). A tenor con ello, se le otorga a la persona empleada una causa de acción si, por realizar una actividad protegida, es despedida, amenazada o discriminada en el empleo. *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra; *Rivera Prudencio v. Mun. De San Juan*, 170 DPR 149, 159 (2007); *Cintrón v. Ritz Carlton*, 162 DPR 32, 37 (2004).

El Artículo 2 de la Ley Núm. 115-1191, *supra*, establece que cualquier persona que alegue una violación al estatuto puede instar

una acción civil en contra de su patrono dentro del término de tres (3) años de que ocurra la violación y solicitar que "se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado". 29 LPRA sec. 194a(b). Ahora bien, para establecer un caso de represalias bajo la Ley Núm. 115-1991, *supra*, el empleado puede: (a) probar mediante evidencia directa o circunstancial un nexo causal entre la conducta del patrono y el daño que sufrió, o (b) establecer un caso *prima facie* mediante evidencia que demuestre que: (1) que participó en una de las actividades protegidas por la Ley Núm. 115-1991, *supra*, y (2) que subsiguientemente su patrono lo despidió, amenazó o lo discriminó (nexo causal). 29 LPRA sec. 194a(c). *Rivera Menéndez v. Action Service*, 185 DPR 431, 445, citando a *Feliciano Martes v. Sheraton*, supra. Una vez la persona empleada establezca lo anterior, "el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido". *Íd.* Si el patrono logra establecerlo, la persona empleada debe demostrar que la razón alegada por el patrono realmente era un mero pretexto para el despido. *Íd.*; *Feliciano Martes v. Sheraton*, supra; *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 362; *Hernández v. Espinosa*, 145 DPR 248 (1998).

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

Como primer señalamiento de error, la parte apelante sostiene que el Tribunal de Primera Instancia erró al adoptar como ciertos los hechos de la *Moción de Sentencia Sumaria* relacionados con los deberes y funciones que Nieves Rodríguez realizaba en su posición de *group leader*, conforme se desprende de la descripción del puesto, aun cuando la parte apelante presentó evidencia que demostraba

que realizaba deberes y funciones que no aparecían en la descripción del puesto que ocupaba y que le fueron removidos una vez culminó el *cross training*. A su vez, en su segundo señalamiento de error, plantea que el foro primario incidió al adoptar como cierto el hecho de que, luego del *cross training*, Nieves Rodríguez continuó trabajando en su posición de *group leader* con las mismas funciones que ejercía antes del *cross training*, aun cuando la parte apelante estableció que, aunque fue asignado a su mismo turno en el almacén, Clorox le quitó sus funciones de supervisión de empleados; la asignación de tareas y funciones en el almacén; la asistencia a las reuniones diarias con los gerenciales; y le asignó funciones de operador de montacarga. Por estar relacionados entre sí, discutiremos los referidos errores conjuntamente.

Hemos examinado cuidadosamente *de novo* el trámite procesal, el expediente ante nos, los escritos de las partes, así como la normativa aplicable, y concluimos que el foro *a quo* no incidió en su determinación en cuanto a los errores señalados. Nos explicamos.

Contrario a lo argumentado por el apelante, durante todo el proceso del *cross training*, Nieves Rodríguez mantuvo su posición de *group leader* y ejerció todas las responsabilidades claves de su posición, conforme a la descripción del puesto que ocupa. Asimismo, luego de que culminó el *cross training*, retomó su horario de trabajo regular y las respectivas funciones que ejerce desde el 2019 como *group leader*. A pesar de que Nieves Rodríguez sostuvo que, luego de que culminó el *cross training*, le eliminaron funciones que no le fueron devueltas, lo cierto es que, según la descripción del puesto de *group leader*, a este no le correspondían las funciones que alega que son de importancia, ya que las mismas no aparecen en la descripción del puesto que ocupa. Es decir, de la descripción del puesto de *group leader* que recibió Nieves Rodríguez cuando fue

transferido al PDC, no surge que el *group leader* tenía los deberes de supervisar empleados; asignar trabajos y funciones a los empleados del almacén; ni asistir a las reuniones diarias con los gerenciales de la planta. Por otra parte, como parte del *cross training*, los turnos por los que rotó Nieves Rodríguez requirieron que este operara un montacarga con más frecuencia. Ahora bien, dichas funciones eran parte de las responsabilidades claves de su posición de *group leader*, conforme la descripción del puesto, por lo que dichas funciones no se pueden considerar como una degradación del puesto que ocupa. Además, Nieves Rodríguez admitió en su deposición que no existe una función dentro de la descripción del puesto de *group leader* que haya dejado de ejercer luego de culminado el *cross training*. En atención a lo anterior, concluimos que el foro primario no incidió al adoptar como ciertos los hechos de la *Moción de Sentencia Sumaria* y determinar que las funciones esenciales de Nieves Rodríguez, como *group leader*, son las descritas en la descripción del puesto y que, una vez culminado el *cross training*, este ejercía las correspondientes responsabilidades y funciones del puesto que ocupa.

Por otro lado, como tercer señalamiento de error, la parte apelante sostiene que el foro *a quo* erró al concluir que la posición de Warehouse RP-PDC Coordinator era una posición con unos deberes y funciones distintos a los del *group leader*, a pesar de que estableció que las funciones de la posición de Warehouse RP-PDC Coordinator eran las mismas que Nieves Rodríguez había realizado por años como *group leader*. Asimismo, Nieves Rodríguez argumentó que podía ocupar la posición de Warehouse RP-PDC Coordinator, pero que, el mismo día en que radicó la *Querella*, se le informó que no fue seleccionado para dicha posición. Sobre este particular, añade que la decisión de descalificarlo para la posición de Warehouse RP-PDC Coordinator fue en represalia por la *Querella*

radicada y no por el hecho de que este no cumplía con los requisitos mínimos del puesto.

Examinado el expediente ante nos, así como la prueba documental que obra en autos, colegimos que el foro primario no incidió en cuanto al tercer error señalado por la parte apelante. Según se desprende de la descripción del puesto de Warehouse RP-PDC Coordinator, dicha posición no comparte ninguna responsabilidad clave con la posición de *group leader*, ya que la misma incluye responsabilidades de supervisión de otros empleados y es catalogada como una posición gerencial. Por lo tanto, la posición de Warehouse RP-PDC Coordinator, es una distinta a la de *group leader* y no absorbió las funciones ni responsabilidades de la posición de *group leader* que ocupa Nieves Rodríguez en PDC. Además, dentro de los requisitos mínimos de la posición de Warehouse RP-PDC Coordinator, se encuentra tener un bachillerato universitario y un mínimo de tres (3) años de experiencia en administración de almacenes, operaciones y supervisión. A pesar de que Nieves Rodríguez entendía que cumplía con los requisitos para ocupar dicha posición, lo cierto es que este no poseía estudios universitarios ni la experiencia de trabajo necesaria para ocupar el puesto. Por lo antes expuesto, carece de méritos el argumento del apelante en cuanto a que la decisión de descalificar a Nieves Rodríguez para la posición de Warehouse RP-PDC Coordinator fue en represalia por la *Querella* radicada y no por el hecho de que no cumplía con los requisitos mínimos del puesto.

Como cuarto y último señalamiento de error, el apelante aduce que el foro de origen incidió al resolver que no sufrió ninguna acción adversa en su empleo y que no fue sometido a un ambiente hostil de trabajo, por lo que no pudo establecer un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra*. Alega que existen controversias de hechos materiales en cuanto a si Clorox tomó

acciones adversas en su contra. En específico, señala que Clorox realizó las siguientes acciones: (1) cambió el turno de su trabajo; (2) tomó acciones disciplinarias en su contra por razones falsas e injustificadas; (3) eliminó sus funciones de importancia y le asignó funciones relacionadas a las de un operador de montacargas; y (4) no lo consideró para ocupar la posición de Warehouse RP-PDC Coordinator.

Surge del expediente que el *cross training* implementado por Clorox se realizó con el único propósito de que todos los empleados del PDC pudieran ejercer las funciones de STO y facturación, para que de esta manera no se paralizara el flujo de materiales y productos en el PDC. Ello no significó un intento de parte de Clorox de tomar acción adversa, restándole funciones a Nieves Rodríguez, ni una alteración en las responsabilidades y trabajo cotidiano manejado por este en la empresa. Se desprende claramente que el proceso del *cross training* fue uno temporero en el cual todos los empleados de PDC rotaron sus turnos y horarios cada dos (2) semanas, así como sus funciones. Ante este escenario, Nieves Rodríguez mantuvo su posición de *group leader* y, luego de que culminó el *cross training*, retomó su horario de trabajo regular y las respectivas funciones que ejerce desde el 2019 como *group leader*.

Por otra parte, reiteramos que las funciones del puesto de *group leader* están expresamente plasmadas en la descripción del mismo y, durante todo el proceso del *cross training*, Nieves Rodríguez ejerció todas las responsabilidades claves de su posición. Asimismo, puntualizamos que la posición de Warehouse RP-PDC Coordinator es una posición distinta a la de *group leader* y requiere un bachillerato universitario y un mínimo de tres (3) años de experiencia en administración de almacenes, operaciones y supervisión, por lo que Nieves Rodríguez no fue seleccionado para asumir el puesto, ya que no cumplía con los requisitos mínimos del

mismo. De otra parte, Nieves Rodríguez tampoco fue amonestado por razones injustificadas, sino que, más bien, el correo electrónico que recibió de parte de su supervisora fue una sugerencia a que evitara comentarios que no sean del trabajo para evitar malentendidos con los demás empleados. No surge del expediente ante nuestra consideración que, aparte de dicho correo electrónico, Nieves Rodríguez haya recibido alguna amonestación. Por tanto, Nieves Rodríguez no fue objeto de acciones adversas en su contra ni tampoco fue sometido a un ambiente hostil de trabajo.

Según el derecho esbozado, para establecer un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra,* el empleado debe probar que, por participar en una actividad protegida por la Ley Núm. 115-1991, *supra,* es despedido, amenazado, o discriminado en el empleo. En el caso ante nos, Nieves Rodríguez no posee una causa de acción en contra de Clorox por ser víctima de represalias, toda vez que los términos y condiciones de su empleo permanecieron inalterados y no presentó ninguna evidencia que sustente una acción adversa de su patrono. No surge del expediente ante nos, que Nieves Rodríguez haya sido despedido, amenazado o discriminado por motivo de sus quejas, en cuanto a sus términos y condiciones de trabajo. Por lo anteriormente expuesto, coincidimos con lo determinado por el foro primario, pues resulta forzoso concluir que la parte apelante falló en establecer una causa de acción al amparo de la Ley Núm. 115-1991, *supra.* Tampoco logró controvertir lo expuesto por la parte apelada al punto que impidiera la resolución sumaria del presente caso. En conclusión, los errores señalados no se cometieron.

En virtud de lo anterior, colegimos que el Tribunal de Primera Instancia no erró al emitir la *Sentencia* desestimando con perjuicio la *Querella* en contra de la parte apelada. En fin, al evaluar concienzuda y ponderadamente *de novo* los eventos procesales al

palio de la normativa jurídica antes esbozada, coincidimos con la determinación del foro apelado.

**IV**

Por las razones que anteceden, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones